1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   GOLDYN COOPER,                           No.  2:12-cv-00602 KJM KJN P (TEMP)

12                 Plaintiff,

13         v.                                 FINDINGS & RECOMMENDATIONS

14   SCOTT HEATLEY, et al.,

15                 Defendants.

16

17   **I.      Introduction**

18         Plaintiff Goldyn Cooper is a state prisoner, proceeding pro se and in forma pauperis, in

19   this civil rights action filed pursuant to 42 U.S.C. § 1983.  Plaintiff contends that defendants

20   Dr. Scott Heatley, M.D., and Terry Weinholdt were deliberately indifferent to his medical needs

21   while he was incarcerated at Mule State Creek Prison ("MCSP"), in violation of the Eighth

22   Amendment.  Pending before the court is defendants' motion for summary judgment.

23   **II.     Relevant Background**

24         Plaintiff initiated this action on March 8, 2012.  On December 20, 2012, the court

25   screened the complaint, and deemed service appropriate on defendants Weinholdt, Dr.  Heatley

26   and Dr. H. Walter Pepper, M.D.  (ECF No. 4.)  On July 2, 2013, defendants Weinholdt and

27   Dr. Heatley filed a joint answer.  (ECF No. 18.)  On August 15, 2013, defendant Dr. Pepper filed

28   a motion to dismiss.  (ECF No. 22.)  On October 17, 2013, plaintiff filed a statement of non-

opposition to the motion.  (ECF No. 31.)  On January 10, 2014, defendant Dr. Pepper was dismissed from the action.[1]  (ECF No. 33.)

On January 7, 2015, a modified Discovery and Scheduling Order issued, setting March 15, 2015, as the deadline for discovery, and April 15, 2015, as the deadline for filing pretrial motions. (ECF No. 60.)  Defendants' motion for summary judgment was filed on April 15, 2015.  (ECF No. 65.)  Plaintiff filed an opposition (ECF No. 67), and defendants filed a reply.  (ECF No. 69.)

**III.    Undisputed Facts[2]**

At all times relevant to this action, plaintiff was an inmate housed at MCSP.  Defendant Terri Weinholdt was employed as a Chief Support Executive, and Dr. Heatley was employed as the Chief Medical Executive ("CME").[3]

On March 6, 2010, plaintiff suffered a left knee injury while playing basketball.  <u>See</u> Heatley Decl. Ex. A at 1.  Plaintiff was examined on March 20, 2010, and a radiology report revealed a sprain, but an otherwise normal left knee.  <u>Id.</u> at 2, 6.  He was ordered to rest, prescribed pain medication and provided medical chronos for a cold compress and a knee sleeve. Thereafter, plaintiff received two follow-up appointments, but did not appear for either.  <u>See id.</u> at 6-7.  As a result, his pain medication was discontinued and his medical chronos were allowed to lapse.  <u>Id.</u> at 8.

On July 28, 2010, plaintiff sought medical care due to swelling in his knee.  Heatley Decl. Ex. A at 9.  Following an examination on August 12, 2010, plaintiff was prescribed pain medication and directed to submit a health care request form if his condition worsened.  <u>Id.</u> at 11. On August 27, 2010, plaintiff sought additional care, and was examined by a nurse on August 31, 2010.  <u>Id.</u> at 11-12.  He was then referred to a doctor.

---

[1] For this reason, the term "defendants," when used hereinafter and not otherwise qualified, should be taken to refer collectively to Weinholdt and Dr. Heatley, the two remaining defendants in the action.

[2] All facts are undisputed unless noted otherwise.

[3] Dr. Heatley is now employed as the Chief Physician and Surgeon for the Office of Inspector General.  Heatley Decl. ¶ 3.

1    Dr. Hashimoto, a physician and surgeon working as a primary care doctor at MCSP, is

2 one of the doctors who treated plaintiff for his knee injury.  Hashimoto Decl. ¶ 2.  On November

3 18, 2010, Dr. Hashimoto examined plaintiff, diagnosed him with an ACL tear, and submitted a

4 Physician Request Form for a routine MRI (the "first MRI request").  Heatley Decl. Ex. A at 13.

5    A diagnostic service like an MRI is not given as a matter of routine diagnosis of knee

6 injuries.  Heatley Decl. ¶¶ 4, 6.  Rather, a physician's recommendation for an MRI must meet a

7 set of objective clinical and evidence-based conditions set forth in a set of criteria called the

8 InterQual criteria.  Heatley Decl. ¶¶ 5-6.  Under the InterQual criteria in 2010, an MRI for a knee

9 injury may be approved only for a Grade II or a Grade III injury.[4]  Id.

10    Pursuant to California regulations, each prison, including MCSP, must have a medical

11 authorization review committee ("MARC") that meets to approve or disapprove requests for

12 medical services that are excluded by the regulations, such as an MRI request.  Cal. Code Reg. tit

13 15 § 3352.  These regulations require that the MARC consist of representatives from the health

14 care staff and staff physicians.

15    Defendant Dr. Heatley was one of the four medical staff sitting on the MARC at MCSP.

16 Heatley Decl. ¶¶ 3, 5.  Defendant Weinholdt, who oversees the management of 602 inmate

17 appeals, is not a medical staff member and has never been a member of the MARC.  Weinholdt

18 Decl. ¶¶ 2, 4.

19    Dr. Hashimoto's first MRI request was denied by Dr. Heatley due to "insufficient

20 information."  Heatley Decl. Ex. A at 15-16.  In denying this request, Dr. Heatley, who had never

21 seen or examined plaintiff in connection with his knee injury, relied exclusively on information

22 written in Dr. Hashimoto's request for services form.  Heatley Decl. ¶ 8.  Because Dr.

23 Hashimoto's request did not grade plaintiff's injury, Dr. Heatley could not determine if it was a

24 Grade II or Grade III injury to meet the InterQual criteria.  Id. ¶ 10.  There was also no

25 information as to whether more conservative treatments had been tried but failed.  Id.  Instead of

26
_____

27 [4] Ligamentous injuries are classified according to the amount of instability (laxity) demonstrated on a physical examination when the joint is subjected to stress.  Standard grades are Grade I (pain without instability), Grade II (instability with a palpable endpoint), and Grade III (instability

28 without a palpable endpoint).  Heatley Decl. Ex. B.

1  the MRI, Dr. Heatley ordered rest, physical therapy, and a brace for plaintiff.  Heatley Decl. Ex.

2  A at 15.

3  Plaintiff filed a Health Care Services Request Form following the denial of the first MRI

4  request.  Heatley Decl. Ex. A at 17.  As a result, he was again seen by Dr. Hashimoto in late-

5  December 2010, who noted that he would appeal the MRI denial at the next MARC meeting.  Id.

6  at 18.

7  On February 3, 2011, Dr. Hashimoto submitted a new Physician Request for Services

8  form to the MARC for an orthopedist consult, but he did not appeal the denial of the first MRI

9  request.  Heatley Decl. ¶ 11, Ex. A at 22.  Dr. Hashimoto's request was approved by Dr.

10  Christopher Smith, and plaintiff was referred to an orthopedist.  Heatley Decl. ¶ 11, Ex. A at 22.

11  Dr. Heatley does not recall if he participated in that committee decision on February 3, 2011.

12  Heatley Decl. ¶ 11.

13  On March 24, 2011, plaintiff saw an orthopedist, Dr. Stephen Gaal, at San Joaquin

14  General Hospital.  Heatley Decl. Ex. A at 23-24.  Dr. Gaal's notes indicate that plaintiff "needs an

15  MRI exam of the left knee.  This is ordered by this request.  It will be arranged when he can be

16  reevaluated."  Id. at 24.

17  On April 7, 2011, Dr. Hashimoto submitted his second request for an MRI (the "second

18  MRI request") with a note to see the attached orthopedist's recommendation.  Heatley Decl. Ex.

19  A at 26-27.  On April 22, 2011, Dr. Heatley denied the second MRI request for "insufficient

20  information," noting that "IQ criteria not met."  Id.  Dr. Gaal's report was not attached to Dr.

21  Hashimoto's request, and Dr. Heatley was not made aware of Dr. Gaal's recommendation at the

22  time of the denial.  Heatley Decl. ¶ 12.  Additionally, the request form itself did not include any

23  history of plaintiff's knee injury or what treatment had already been provided.  Id.  Although Dr.

24  Heatley later learned that Dr. Gaal's report had been cc'd to him, he does not recall receiving the

25  report on or before the denial of the second MRI request.  Id.  Dr. Hashimoto denies ever having

26  made any statement that plaintiff's MRI requests were denied to save money or because of cost.

27  Hashimoto Decl. ¶ 3.

28  ////

4

Dr. Hashimoto resubmitted the request for an MRI (the "third MRI request") with Dr. Gaal's recommendation attached.  Heatley Decl. Ex. A at 27.  Dr. Heatley approved this request on May 17, 2011.  Id.  On July 28, 2011, plaintiff received an MRI.  See Heatley Decl. Ex. A at 28.

In August 2011, Dr. John Dowdak, an orthopedic surgeon at San Joaquin General Hospital, examined and treated plaintiff on referral from MCSP.  Dowdak Decl. ¶ 4.  Dr. Dowdak is a board certified orthopedic surgeon who has been practicing for over 20 years.  Id. ¶ 2.  Dr. Dowdak's entire practice involves examining, diagnosing, treating, and operating on patients, including patients with ACL injuries like plaintiff.  Id.  Following the examination and review of the MRI, Dr. Dowdak concluded that plaintiff's knee injury showed a partial tear of the ACL and a medial meniscus tear, but no acute bony abnormalities.  Id. ¶ 4.  This indicated that plaintiff had only minor orthopedic injuries that could be treated conservatively, without the need for surgery.  Id.  Dr. Dowdak told plaintiff as much, finding MCSP's conservative course of treatment to be appropriate under the circumstances.  Id.  Plaintiff, however, opted to proceed with surgery.

On September 30, 2011, Dr. Dowdak successfully performed a left diagnostic operative arthroscopy on plaintiff's left knee.  Dowdak Decl. ¶ 7.  Plaintiff has responded and recovered well to the surgery.  Id.

Plaintiff claims that he was told by Dr. Dowdak that he will require complete reconstructive surgery on his left knee in a few years.  Compl. ¶ 28.  Dr. Dowdak also allegedly told Plaintiff that "Repeatedly denying the MRI requests that would have shown immediate need for surgery was criminal."  Id.  Dr. Dowdak denies ever telling plaintiff that he will require complete reconstructive surgery in a few years.  Dowdak Decl. ¶ 8.  He further denies ever telling plaintiff that he would have a normal left knee with no post-surgery complications had his knee been timely operated on.  Id.  Lastly, Dr. Dowdak denied ever saying that the denial of the MRI requests was criminal and instead recalls that plaintiff himself made this statement.  Id.

**IV.    Legal Standards**

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

1    Civ. P. 56(a).

2          Under summary judgment practice, the moving party "initially bears the burden of

3    proving the absence of a genuine issue of material fact." In re Oracle Corp. Sec. Litig., 627 F.3d

4    376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving

5    party may accomplish this by "citing to particular parts of materials in the record, including

6    depositions, documents, electronically stored information, affidavits or declarations, stipulations

7    (including those made for purposes of the motion only), admissions, interrogatory answers, or

8    other materials" or by showing that such materials "do not establish the absence or presence of a

9    genuine dispute, or that the adverse party cannot produce admissible evidence to support the

10   fact." Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at

11   trial, "the moving party need only prove that there is an absence of evidence to support the

12   nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325.); see

13   also Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after adequate

14   time for discovery and upon motion, against a party who fails to make a showing sufficient to

15   establish the existence of an element essential to that party's case, and on which that party will

16   bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.  "[A] complete failure of proof

17   concerning an essential element of the nonmoving party's case necessarily renders all other facts

18   immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as

19   whatever is before the district court demonstrates that the standard for entry of summary

20   judgment . . . is satisfied." Id. at 323.

21         If the moving party meets its initial responsibility, the burden then shifts to the opposing

22   party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita

23   Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the

24   existence of this factual dispute, the opposing party may not rely upon the allegations or denials

25   of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or

26   admissible discovery material, in support of its contention that the dispute exists.  See Fed. R.

27   Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the

28   fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

1   governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv.,

2   Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

3   genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

4   party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

5          In the endeavor to establish the existence of a factual dispute, the opposing party need not

6   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

7   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

8   trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

9   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

10  Matsushita, 475 U.S. at 587 (citations omitted).

11         "In evaluating the evidence to determine whether there is a genuine issue of fact," the

12  court draws "all reasonable inferences supported by the evidence in favor of the non-moving

13  party." Walls v. Central Costa County Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011).  It is the

14  opposing party's obligation to produce a factual predicate from which the inference may be

15  drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

16  aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

17  party "must do more than simply show that there is some metaphysical doubt as to the material

18  facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

19  nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation

20  omitted).

21  **V.     Discussion**

22         The Civil Rights Act under which this action was filed provides as follows:

23              Every person who, under color of [state law] . . . subjects, or causes
               to be subjected, any citizen of the United States . . . to the
24              deprivation of any rights, privileges, or immunities secured by the
               Constitution . . . shall be liable to the party injured in an action at
25              law, suit in equity, or other proper proceeding for redress.

26  42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

27  actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

28  Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

7

1   (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

2   meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or

3   omits to perform an act which he is legally required to do that causes the deprivation of which

4   complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

5           While the Eighth Amendment of the United States Constitution entitles plaintiff to

6   medical care, the Eighth Amendment is violated only when a prison official acts with deliberate

7   indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th

8   Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082–83 (9th

9   Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d

10  1091, 1096 (9th Cir. 2006).  Plaintiff "must show (1) a serious medical need by demonstrating

11  that failure to treat [his] condition could result in further significant injury or the unnecessary and

12  wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately

13  indifferent."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096).  Deliberate indifference is

14  shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need,

15  and (b) harm caused by the indifference."  Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at

16  1096).  The requisite state of mind is one of subjective recklessness, which entails more than

17  ordinary lack of due care.  Snow, 681 F.3d at 985 (citation and quotation marks omitted);

18  Wilhelm, 680 F.3d at 1122.

19          "A difference of opinion between a physician and the prisoner-or between medical

20  professionals-concerning what medical care is appropriate does not amount to deliberate

21  indifference."  Snow v. McDaniel, 681 F.3d at 987 (citing Sanchez v. Vild, 891 F.2d 240, 242

22  (9th Cir. 1989)); Wilhelm v. Rotman, 680 F.3d at 1122–23 (citing Jackson v. McIntosh, 90 F.3d

23  330, 332 (9th Cir. 1986)).  Rather, plaintiff "must show that the course of treatment the doctors

24  chose was medically unacceptable under the circumstances and that the defendants chose this

25  course in conscious disregard of an excessive risk to [his] health."  Snow, 681 F.3d at 988 (citing

26  Jackson, 90 F.3d at 332) (internal quotation marks omitted).  Deliberate indifference may be

27  found if defendants "deny, delay, or intentionally interfere with [a prisoner's serious need for]

28  medical treatment."  Hallet v. Morgan, 296 F.3d 732, 734 (9th Cir. 2002).

1   In order to prevail on a claim involving defendants' choices between alternative courses of

2   treatment, a prisoner must show that the chosen treatment "was medically unacceptable under the

3   circumstances" and was chosen "in conscious disregard of an excessive risk to plaintiff's health."

4   Jackson v. McIntosh, 90 F.3d at 332.  In other words, so long as a defendant decides on a

5   medically acceptable course of treatment, his actions will not be considered deliberately

6   indifferent even if an alternative course of treatment was available.  Id.

7       **1.  Terri Weinholdt**

8   Defendants move for summary judgment on plaintiff's claim against defendant Weinholdt

9   on the ground that she played no role in the denial of the MRI requests.  Because plaintiff submits

10   no evidence or argument in opposition to the motion relating to this defendant, the court

11   recommends that summary judgment be entered for Weinholdt.

12       **2.  Dr. Heatley**

13   Defendants next move for summary judgment on plaintiff's claim against Dr. Heatley.

14   They argue that the undisputed facts demonstrate that this defendant did not act with deliberate

15   indifferent to plaintiff's medical needs.  Rather, the evidence shows that Dr. Heatley merely chose

16   a conservative course of treatment, that his denials of the first and second MRI requests were

17   based on lack of information included in those requests, and that he did not have knowledge of

18   any serious risk of harm when denying the MRI requests.

19   Plaintiff's objections can be summarized as follows:  (1) the declarations submitted by the

20   defense witnesses are inadmissible, and (2) Dr. Heatley should have known about the extent of

21   plaintiff's injuries because he admits that he had access to plaintiff's medical file, because Dr.

22   Hashimoto's notes indicated the nature of plaintiff's injury, and because, pursuant to MCSP

23   regulations, Dr. Hashimoto should have been present at the MARC meetings.

24       **a.  Witness Declarations**

25   Plaintiff first objects to the propriety of the witness statements submitted by defendants.

26   He claims that they are inadmissible because "the declarations never state that they were sworn

27   under the penalty of perjury of the state of California and or the United States."  Pl.'s Obj. and

28   Opp'n to Sep. Statements (ECF No. 68) at 2.  As defendants rightly point out, though, a

1   declaration signed with the United States need only state: "I declare (or certify, verify, or state)

2   under penalty of perjury that the foregoing is true and correct.  Executed on (date).  (Signature)."

3   28 U.S.C. § 1746(2).  Because each of the declarations submitted in support of defendants'

4   motion for summary judgment complies with this requirement, they are all admissible.

5              **b.  Knowledge of Plaintiff's Injury**

6        Plaintiff next argues that Dr. Heatley was or should have been aware of the extent of his

7   knee injury because this defendant had access to plaintiff's medical file; Dr. Hashimoto's

8   Physician Request Form included the nature of plaintiff's injury; and, pursuant to MCSP

9   regulations, Dr. Hashimoto should have been present at the MARC meetings.

10       Plaintiff's argument that Dr. Heatley had access to his medical file is premised on a

11  purported admission in Dr. Heatley's declaration filed in support of the instant motion.  There,

12  Dr. Heatley states that "[i]n making this declaration, I reviewed the Unified Health Record (UHR)

13  of Plaintiff Goldyn Cooper."  Heatley Decl. ¶ 7.  Plaintiff argues that if Dr. Heatley had access to

14  the medical file before making this declaration, he should have been able to access it before

15  denying the MRI requests, and his failure to do so amounts to deliberate indifference.  Defendants

16  counter that these documents only became available through discovery in this action.  But even if

17  the documents were available to Dr. Heatley before he denied the MRI requests, Dr. Heatley's

18  failure to access those records would establish, at best, negligence, not deliberate indifference.

19  "If a person should have been aware of the risk, but was not, then the person has not violated the

20  Eighth Amendment, no matter how severe the risk."  <u>Gibson v. County of Washoe, Nev.</u>, 290

21  F.3d 1175, 1188 (9th Cir. 2002) (internal citations omitted).  Simply put, "there is no evidence

22  that Dr. [Heatley] was subjectively aware that [his] failure to [approve the MRI requests] created

23  a 'substantial risk of serious harm' to [plaintiff]."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1970).

24       Plaintiff next argues that Dr. Heatley must have known about the severity of his knee

25  injury because Dr. Hashimoto's February 2011 and April 2011 Physician Request Forms included

26  a principle diagnosis of "Lt Knee ACL/MCL/meniscal tear" and "MCL tear/ ACL tear,"

27  respectively.  The February 2011 request, however, was approved by Dr. Christopher Smith, not

28  Dr. Heatley.  Heatley Decl. Ex. A at 22.  And plaintiff, who is not a medical professional, submits

1   no evidence suggesting that Dr. Hashimoto's diagnosis would have satisfied the InterQual criteria

2   for an MRI referral or provided Dr. Heatley with necessary information to make that

3   determination.

4           Finally, plaintiff asserts that Dr. Heatley would have known about the nature of plaintiff's

5   knee injury through Dr. Hashimoto's presence at the MARC meeting(s).  In support, plaintiff

6   submits an excerpt of a manual titled "MCSP – Inmate Medical Services Local – Operational

7   Procedure – Specialty Services."  Pl.'s Opp'n Ex. B.  This excerpt, with a revised date of

8   September 2012, provides that, when a request for a service is referred to the MARC, "[t]he

9   [primary care physician ("PCP")] shall attend the MAR Committee and present the case for

10  consideration."  Id. (ECF No. 67 at 12).  Plaintiff argues that, pursuant to this operating

11  procedure, Dr. Hashimoto would have been present at the MARC meetings to discuss plaintiff's

12  knee injury.  However, with a revised date of September 2012, there is no indication that the

13  manual's directive regarding a PCP's attendance at the MARC meeting was in effect during the

14  time period at issue in this case (2010 and 2011).  Moreover, Dr. Heatley's unopposed declaration

15  provides that the only information relied on in denying the MRI requests was the information

16  included in Dr. Hashimoto's Physician Request Forms, not any statements made by a PCP at the

17  MARC meetings.  There is simply no evidence – only speculation – that Dr. Hashimoto was

18  present during the MARC meetings when plaintiff's MRI requests were denied.  Under Rule 56, a

19  nonmovant must point to "more than mere speculation, conjecture, or fantasy."  National Steel

20  Corp. v. Golden Eagle Ins. Co., 121 F.3d 496, 502 (9th Cir. 1997).

21          Because plaintiff has failed to come forth with any evidence sufficient to create a genuine

22  dispute as to a material fact, the undersigned recommends that defendants' motion for summary

23  judgment be granted.  In light of this recommendation, the court declines to reach defendants'

24  argument that they are entitled to qualified immunity.

25  **VI.    Conclusion**

26          Based on the foregoing, IT IS HEREBY RECOMMENDED that defendants' motion for

27  summary judgment (ECF No. 65) be granted.

28  ////

1          These findings and recommendations are submitted to the United States District Judge

2    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

3    after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

6    objections shall be served and filed within fourteen days after service of the objections.  The

7    parties are advised that failure to file objections within the specified time may waive the right to

8    appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

9    Dated:  April 11, 2016

10

11   KENDALL J. NEWMAN
     UNITED STATES MAGISTRATE JUDGE

12

13   ;coop0602.msj

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28